49 N.J. 460 (1967)
231 A.2d 353
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
THEODORE DILLEY, DEFENDANT-APPELLANT.
The Supreme Court of New Jersey.
Argued May 8, 1967.
Decided July 5, 1967.
*461 Mr. C. John Stroumtsos argued the cause for appellant.
Mr. Richard S. Cohen, Assistant Prosecutor, argued the cause for respondent (Mr. Edward J. Dolan, Middlesex County Prosecutor, attorney).
The opinion of the court was delivered by JACOBS, J.
The defendant Dilley was convicted of carrying a concealed weapon in violation of N.J.S. 2A:151-41. His appeal to the Appellate Division resulted in a judgment of affirmance and he then appealed to this Court alleging that *462 the State's case was based on an unconstitutional search and seizure of the weapon.
During the early weekday morning of December 29, 1964 Lieutenant Conway, a veteran member of the New Brunswick Police Department, was patrolling the New Brunswick streets in a radio police car. He was in a low income, high crime rate, section of the city when he saw two men walking on Neilson Street between Oliver and Morris Streets. It was then about 3 A.M. and as the men walked, they kept turning their heads every few steps looking to the rear. He drove on, making a series of turns, until he observed the men standing between two automobiles in a municipal parking lot. As he pulled into the lot, the men turned and walked back to the street. He followed and called to them to stop. He got out of his car, asked them what they were doing there and they replied "nothing." He told them they were under arrest and he gave the defendant Dilley "a quick frisk" by patting him on the right side of his ski jacket. He felt a gun in Dilley's pocket and removed it. It was a loaded .38 caliber revolver. The other man, named Brinkley, was also found to be armed. Brinkley was convicted, along with Dilley, of carrying a concealed weapon but Brinkley has not taken any appeal.
On Dilley's pretrial motion to suppress the weapon as having been illegally obtained, Lieutenant Conway testified as to the circumstances. He knew the area very well, having been born and brought up there, and he described it in detail. He had worked in the area as a police officer for fifteen years, knew the people there and both Dilley and Brinkley were strangers to him. Their appearance and conduct in view of the time and place had naturally aroused his interest and had furnished him, as an experienced officer, with more than enough reason to suspect and inquire. Cf. People v. Beasley, Cal. App., 58 Cal. Rptr. 485, 490-491 (1967). When he heard their answer to his question as to what they were doing, he considered that there was sufficient cause for their arrest under the New Brunswick Ordinance which provides that an apprehended person who cannot give a good account of himself *463 and is in the city for an unlawful purpose is a disorderly person. See N.J.S. 2A:170-1; State v. Salerno, 27 N.J. 289 (1958); cf. United States v. Margeson, 259 F. Supp. 256 (E.D. Pa. 1966). When he frisked Dilley he did it for self-protection. He described his action as "common police procedure" in accordance with formal instructions he had received in both federal and state police schools. He stressed that he was alone when he confronted the two men, that he did not know "what they were carrying" and that it was "very well possible" he could have been "killed by one of them."
In denying the motion, the trial court found that, in view of the circumstances, there was a valid arrest and incidental taking of the gun and, in the alternative, there was a lawful right to question Dilley and incidentally frisk him for the officer's protection. As to the first ground the defendant denies that the arrest was a lawful one and he suggests that it was a sham rather than a bona fide arrest (Taglavore v. United States, 291 F.2d 262, 265 (9 Cir. 1961)) although the record furnishes no basis whatever for that charge. He does not attack the ordinance's validity (cf. Douglas, "Vagrancy and Arrest on Suspicion," 70 Yale L.J. 1 (1960)) but urges that the evidence did not establish that Dilley was in fact in the city for an unlawful purpose in violation of it. See State v. Salerno, supra, 27 N.J., at p. 293. However the issue is not whether there was sufficient proof to establish an offense under the ordinance; the issue is rather whether the officer had probable cause to believe that Dilley had offended its terms by failing to give a good account of himself while in New Brunswick for an unlawful purpose. See Ricks v. United States, 228 A.2d 316, 321-322 (D.C. Ct. App. 1967); Remington, "The Law Relating to `On the Street' Detention, Questioning and Frisking of Suspected Persons and Police Arrest Privileges in General," 51 J. Crim. L.C. & P.S. 386, 391 (1960); Note, "Detention, Arrest, and Salt Lake City Police Practices," 9 Utah L. Rev. 593, 606 (1965).
In State v. Mark, 46 N.J. 262 (1966) we pointed out that probable cause means less than legal evidence necessary *464 to convict though more than mere naked suspicion; that it is a commonsensible rather than a technical concept; and that it deals with the reasonable probabilities upon which officers must act quickly for the protection of society rather than with the proof beyond reasonable doubt which the State must have to proceed to trial and conviction. 46 N.J., at p. 271; see Brinegar v. United States, 338 U.S. 160, 175-177, 69 S.Ct. 1302, 93 L.Ed. 1879, 1890-1891 (1949). Lieutenant Conway had observed the suspicious behavior of Dilley and Brinkley along Nielson Street, he knew they were strangers to the area and he observed them at three o'clock in the morning standing between two cars in the municipal parking lot, he saw them leave the parking lot as soon as they saw him arrive, and, in response to his inquiry as to what they were doing, he received an answer which tended to strengthen his suspicions that they were up to no good. Considering all of the circumstances, may it not fairly be said that the officer had probable cause for believing that Dilley and his companion were intent on stealing a car (as was confirmed by their later disclosures) and, that being so, the arrest and incidental taking of the weapon were lawful without regard to the State's ultimate ability to obtain a conviction under the ordinance. See State v. Mark, supra, 46 N.J., at pp. 271-273; State v. Cook, 47 N.J. 402, 414 (1966). However, we need not pursue this issue for we are satisfied that the trial court's alternative ground for denial of the motion represented a sound approach to the important constitutional and enforcement problems presented and should be reaffirmed here.
The police officer's duties include vital preventive roles. In their performance he clearly should have the right to stop persons on the street for summary inquiry where, as here, the circumstances are so highly suspicious as to call for such inquiry. Reason and common sense support this procedure as do many statutory enactments and judicial decisions here and elsewhere. See People v. Rivera, 14 N.Y.2d 441, 252 N.Y.S.2d 458, 201 N.E.2d 32 (1964), certiorari denied 379 U.S. 978, 85 S.Ct. 679, 13 L.Ed.2d 568 (1965); Commonwealth *465 v. Lehan, 347 Mass. 197, 196 N.E.2d 840 (1964); Commonwealth v. Hicks, 209 Pa. Super. 1, 223 A.2d 873 (1966); State v. Terry, 5 Ohio App.2d 122, 214 N.E.2d 114 (1966), certiorari granted 385 U.S. 1029, 87 S.Ct. 758, 17 L.Ed.2d 677 (1967); see also State v. Taylor, 81 N.J. Super. 296, 313 (App. Div. 1963); State v. Hope, 85 N.J. Super. 551, 554 (App. Div. 1964); State v. Bell, 89 N.J. Super. 437, 444 (App. Div. 1965); cf. United States v. Vita, 294 F.2d 524, 530 (2 Cir. 1961), certiorari denied 369 U.S. 823, 82 S.Ct. 837, 7 L.Ed.2d 788 (1962); People v. Mickelson, 59 Cal.2d 448, 30 Cal. Rptr. 18, 380 P.2d 658, 660 (1963); Commonwealth v. Ballou, Mass., 217 N.E.2d 187, 190 (1966), certiorari denied 385 U.S. 1031, 87 S.Ct. 760, 17 L.Ed.2d 679 (1967); Willey v. Peace [1951] 1 K.B. 94, 96-97 (1950). See also ALI, Model Code of Pre-Arraignment Procedure § 2.02(2) (Tent. Draft No. 1, 1966); Warner, "The Uniform Arrest Act," 28 Va. L. Rev. 315, 344 (1942); 41 St. John's L. Rev. 610 (1967); 4 Houston L. Rev. 589 (1966); 50 Cornell L.Q. 529 (1965); 65 Colum. L. Rev. 848 (1965); 30 Brooklyn L. Rev. 274 (1964); 33 Fordham L. Rev. 211 (1964); cf. Traynor, "Mapp v. Ohio At Large In the Fifty States," 1962 Duke L.J. 319, 334.
In People v. Rivera, supra, several city detectives were patrolling in a police car early in the morning when they saw two men acting suspiciously in front of a bar and grill. When the men saw the detectives they started to leave. At that point one of the detectives approached them, told them he was a policeman and frisked the defendant. He felt a gun and removed it. The lower court granted the defendant's motion to suppress but this was reversed by the Court of Appeals with Judge Fuld dissenting. In the course of his majority opinion, Judge Bergan pointed out that the right to stop and question a person whose presence or conduct is suspicious was recognized at common law and is now generally acknowledged "as a reasonable and necessary police authority for the prevention of crime and the preservation of public order." 252 N.Y.S.2d, *466 at p. 462, 201 N.E.2d, at p. 35. Elsewhere in his opinion he had this to say:
"The authority of the police to stop defendant and question him in the circumstances shown is perfectly clear. The business of the police is to prevent crime if they can. Prompt inquiry into suspicious or unusual street action is an indispensable police power in the orderly government of large urban communities. It is a prime function of city police to be alert to things going wrong in the streets; if they were to be denied the right of such summary inquiry, a normal power and a necessary duty would be closed off." 252 N.Y.S.2d at 461, 201 N.E.2d, at 34.
In his dissenting opinion, Judge Fuld did not deny the right of the police to stop and question; on the contrary, he said that he had "no doubt that the police, in the proper performance of their duties, have a responsibility to investigate suspicious activity and that one permissible form of investigation is the temporary stopping and questioning of individuals so engaged." 252 N.Y.S.2d, at p. 467, 201 N.E.2d, at p. 38. His difference with the majority related to the frisk itself which he viewed as an impermissible search, absent a prior arrest based on probable cause. On this issue the majority, while acknowledging that the frisk invaded privacy somewhat, considered it to be far less an invasion than a full search and supported it as a necessary safety measure incidental to the inquiry; as the majority put it:
"If we recognize the authority of the police to stop a person and inquire concerning unusual street events we are required to recognize the hazards involved in this kind of public duty. The answer to the question propounded by the policeman may be a bullet; in any case the exposure to danger could be very great. We think the frisk is a reasonable and constitutionally permissible precaution to minimize that danger. We ought not, in deciding what is reasonable, close our eyes to the actualities of street dangers in performing this kind of public duty." 201 N.E.2d at 35.
See also ALI, supra § 2.02(5); Warner, supra, 28 Va. L. Rev., at p. 344; Remington, supra, 51 J. Crim. L.C. & P.S., at pp. 391-392; cf. State v. Terry, supra, 5 Ohio App.2d *467 122, 214 N.E.2d, at p. 120; United States v. Thomas, 250 F. Supp. 771, 782-792 (S.D.N.Y. 1966).
When the police officer stops a person on the street for summary inquiry, the incidental temporary detention is not to be viewed as a formal arrest requiring probable cause. See Commonwealth v. Lehan, supra, 196 N.E.2d, at p. 843; cf. State v. Romeo, 43 N.J. 188, 206 (1964), certiorari denied 379 U.S. 970, 85 S.Ct. 668, 13 L.Ed.2d 563 (1965). In Rios v. United States, 364 U.S. 253, 80 S.Ct. 1431, 4 L.Ed.2d 1688 (1960), the Supreme Court appears to have given recognition to the propriety of the temporary detention which is incidental to routine street interrogation (364 U.S., at p. 262, 80 S.Ct. 1431, 4 L.Ed.2d, at p. 1694); and in Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court took pains to point out that the constitutional restrictions which it announced with respect to interrogations of persons under arrest, were not intended to hamper "the traditional function of police officers in investigating crime" through on-the-scene or other non-custodial inquiries. 384 U.S., at p. 477, 86 S.Ct., at p. 1629, 16 L.Ed.2d, at p. 725. See State v. Rudd, 49 N.J. 310 (1967). Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959) has been cited to us for a different approach but there the Government had stipulated that an arrest actually took place when its agents first stopped the car of the defendants and then proceeded to search it. The majority held that since there was no probable cause at the time of the arrest, the search was improper. In their dissent, Chief Justice Warren and Justice Clark expressed the view that the suspicious behavior of the defendants warranted the stopping of the car, the stopping itself did not amount to an arrest, and the stolen cartons in open view in the car gave sufficient cause for the ensuing arrest and incidental search. 361 U.S., at p. 106, 80 S.Ct. 168, 4 L.Ed.2d, at pp. 140-141.
Moreover, it seems evident to us that the legality of incidental street detention for purposes of summary inquiry *468 should not be permitted to turn on whether it is formally labeled as an arrest but rather on whether it was reasonable in the light of the circumstances. The fourth amendment does not speak in absolute terms but strikes a balance between the interests of the individual in being free from police interference and the interests of society in effective law enforcement. Thus in terms it protects the people's right to security against "unreasonable" searches and seizures. In determining reasonableness, weight must of course be given to all of the pertinent factors including the basis of the suspicion on the part of the police and the nature and extent of the restraint on the individual. Where, as here, the circumstances disclosed highly suspicious activities at three in the morning on the city streets and in the city parking lot, the inquiry was not only reasonably called for but was actually dictated by elemental police responsibilities. The balance was strongly in favor of society for the danger to it was great and the intrusion on the individual by the inquiry itself was minimal. See Barrett, Personal Rights, Property Rights, and the Fourth Amendment, 1960 Supreme Court Review 46, 57-65; cf. People v. Peters, 18 N.Y.2d 238, 242, 273 N.Y.S.2d 217, 220, 219 N.E.2d 595 (1966), prob. juris. noted 386 U.S. 980, 87 S.Ct. 1291, 18 L.Ed.2d 228 (1967); see also People v. Sibron, 18 N.Y.2d 603, 272 N.Y.S.2d 374, 219 N.E.2d 196 (1966), prob. juris. noted 386 U.S. 954, 87 S.Ct. 1042, 18 L.Ed.2d 101 (1967).
More troublesome than the inquiry itself was the frisk which undoubtedly represented a much greater intrusion on the individual. But here again the formal labeling of the action should not be controlling and the test should be its reasonableness in the totality of the circumstances. Thus the courts which uphold the right to stop and inquire recognize, as incidental thereto, the right to frisk when the situation urgently points to the need of such action for the officer's self-protection. See People v. Rivera, supra, 252 N.Y.S.2d 458, 201 N.E.2d, at p. 35; State v. Terry, supra, 214 N.E.2d, at p. 120; People v. Machel, 234 Cal. App.2d 37, 44 Cal. *469 Rptr. 126, 130-132, certiorari denied 382 U.S. 839, 86 S.Ct. 88, 15 L.Ed.2d 81 (1965); Commonwealth v. Hicks, supra, 223 A.2d, at p. 876; Remington, supra, 51 J. Crim. L.C. & P.S., at pp. 391-392; Leagre, "The Fourth Amendment and the Law of Arrest," 54 J. Crim. L.C. & P.S. 393, 419 (1963). In Terry the officer observed men near some stores on Huron Road in Cleveland. Though it was 2:30 in the afternoon of a business day, he considered their actions to be suspicious and when he received mumbled responses to his inquiry as to their names, he frisked them and removed guns from the defendants. After a motion to suppress was denied, the defendant Terry was convicted and his conviction was sustained in an opinion which noted that once it is determined that the officer could validly inquire into the activities of the defendant, "then it follows that the officer ought to be allowed to `frisk' under some circumstances at least, to insure that the suspect does not possess a dangerous weapon which would put the safety of the officer in peril." 214 N.E.2d, at p. 120. Compare the comment by Justice Black in Cooper v. State of California, 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730, 733 (1967) that it would be unreasonable to hold that the police could not search a car "even for their own protection."
As Terry pointed out, the officer who frisks a person he considers dangerous does so, not because he is seeking evidence, but because he wants to protect himself. That being so, the evidential exclusion of the weapon he uncovers would in nowise avoid future conduct of similar nature on his part or serve any of the deterrent purposes of Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081, 84 A.L.R.2d 933 (1961). The situation before us is illustrative. The officer, under circumstances far more suspicious and dangerous than those in Terry, made inquiry as to what the defendant Dilley and his companion were doing. When he received their single response he could have continued the inquiry without taking any action but at the peril of his life. He was a very experienced police officer in a familiar high crime area during the early morning hours and he was alone, confronting two *470 men whose actions were suspicious and who appeared dangerous to him. While he did not know "what they were carrying," he thought they might be armed and that he might be "killed by one of them." In frisking them he followed common police procedure. His patting the right side of Dilley's jacket was by no means a full search and was no more than necessary for self-protection. In view of the totality of the circumstances, the officer's action appears to us to have been entirely reasonable. While the law might nonetheless evidentially exclude the weapons he seized (cf. 17 Syracuse L. Rev. 627, 633 (1966)) and thereby set Dilley and his companion free, the price to society would be high without any compensating protective implementation of individual liberties. See State v. Terry, supra, 214 N.E.2d, at p. 121.
Freedom and privacy are precious rights which must be zealously guarded for the individual. But without the general security of law and order they would lose their meaning for all. This was fully recognized in the fourth amendment which balances the rights of the individual and society and embodies the test of reasonableness. While the Supreme Court has gone to great lengths in vindicating the rights of the individual as guaranteed by the amendment, it has done so with stated awareness of the practical needs of "`effective criminal investigation and law enforcement' in the States" (Ker v. California, 374 U.S. 23, 34, 83 S.Ct. 1623, 1630, 10 L.Ed.2d 726, 738 (1963)) and with stated acknowledgment that the validity of particular police action under the amendment will turn on its reasonableness in the light of "the facts and circumstances of each case" (Cooper v. California, supra, 386 U.S., at p. 59, 87 S.Ct., at p. 790, 17 L.Ed.2d, at p. 732). The Supreme Court has not yet spoken in a case specifically involving temporary street detention and incidental frisk but it will presumably do so in Terry and the related cases now pending before it. When it does, we shall of course faithfully fulfill its pronouncements; in the meantime, we have a clear responsibility to the people of our State to apply the proper constitutional principles as we see them. State v. *471 Coleman, 46 N.J. 16, 34-38 (1965), certiorari denied 383 U.S. 950, 86 S.Ct. 1210, 16 L.Ed.2d 212 (1966). On the record before us, we find no constitutional compulsion or just cause for invalidating police activity which we consider to have been highly efficient and entirely reasonable in the circumstances, and which resulted in the expeditious preferment of the criminal charges against Dilley and his companion and their later trial and conviction. Accordingly, the judgment appealed from is in all respects:
Affirmed.
For affirmance  Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN  7.
For reversal  None.